J-S59009-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA,    :    IN THE SUPERIOR COURT OF
   :          PENNSYLVANIA
          Appellee    :
   :
      v.    :
   :
GREGORY McNATT,    :
   :
          Appellant    :    No. 2509 EDA 2013

Appeal from the Judgment of Sentence Entered May 24, 2013,
In the Court of Common Pleas of Philadelphia County,
Criminal Division, at No. CP-51-CR-0011619-2012.

BEFORE: SHOGAN, J., LAZARUS. J., and STRASSBURGER, J.*

MEMORANDUM BY SHOGAN, J.:            **FILED OCTOBER 28, 2014**

Appellant, Gregory McNatt, appeals from the judgment of sentence entered following his convictions of five counts of robbery, criminal conspiracy, two counts of violating the uniform firearms act ("VUFA"), and possessing an instrument of crime ("PIC"). We affirm.

The trial court summarized the facts of this case as follows:

> On July 21, 2012 at 2:30 A.M., all friends, Sean Korney, Tom Reardon, Mike McEvilly, Will Viskovich and Nicole Mullen, were standing outside a house located at 2008 North 18th Street in Philadelphia waiting for a friend to come let them in. <u>Notes of Testimony ("NT")</u>, Trial, 2/22/13 at 11:15-12:10. A red or maroon SUV driven by Appellant stopped in front of where they were standing. <u>Id</u>. at 12:16-17. Two other individuals were in the car along with Appellant, one in the front passenger seat and the other in the back seat. <u>Id</u>. at 41:1-7.

_____

*Retired Senior Judge assigned to the Superior Court.

Appellant exited the vehicle and approached the friends with a firearm in his hand. Id. at 37:15-9. Appellant pointed the firearm at Korney's chest, racked it and said, "give me everything you got." Id. at 12:16-19. Korney gave Appellant some change and cigarettes. Id. at 12:24-5. Appellant then moved down the line to Reardon, put the firearm against his chest, and told him, "you better give me everything you have." Id. at 39:7-19. Appellant reached into Reardon's pockets and took his iPhone. Id. at 40:1-4. Appellant then moved down the line, pointed the firearm at Mullen and Viskovich and demanded they give him everything they had. Id. at 40:7-9. Appellant then took McEvilly's cell phone and Mullen's purse. Mullen's purse contained approximately $240 and a bus ticket to New York. NT, 2/25/13 7:12-7. Appellant then jumped back into the driver seat of the SUV and sped away with his two associates. NT, Trial, 2/22/13 at 40:21-25.

All four of the witnesses who testified at trial were consistent in their testimony regarding the firearm. Each described the weapon as being silver in color. Id. at 15:7-9, 39:20-1; NT, 2/25/13, 19:9-11, 42:24-43:3. Korney stated that Appellant "cocked" the weapon and that the weapon was "obviously loaded … because he racked it." NT, Trial, 2/22/13 at 12:22, 18:18-21.

After Appellant left the scene, the police were called and arrived within minutes. Id. at 41:16-18. Police then drove the victims to 12th and Lehigh where Appellant and his cohorts had been pulled over in a maroon SUV. Id. at 42:7-21. The SUV and Appellant were identified at that location by the victims. Id. at 42:13-21. Recovered from between the center console and the driver seat was a ski mask and a brown gun holster. NT, 2/25/13 at 75:12-7. Also recovered from the center cup holder of the vehicle were three black cell phones: one iPhone, one T-Mobile, and one AT&T. Id. at 82:14-8. The cell phones were identified as the cell phones previously stolen. Id. at 83: 11-23. Officers also recovered $5 U.S. currency from Appellant, $140 from the front passenger and an additional $27 from the rear passenger. Id. at 87:22-92:25.

Appellant testified. He stated that on the night of the incident his friend Khalil Johnson called and asked him for a ride

home from 13th and Cambria. Id. at 191: 1-192: 25. Appellant agreed to give Khalil a ride, but first he stopped for gas. Id. at 193:14-5. While at the gas station Appellant was approached by a man selling phones. Id. at 195;9-15. Appellant claimed that he purchased two phones from this man, an iPhone and a T-Mobile phone for $25. Id. at 196:8-15. Appellant then stated that he left the gas station and went to 13th and Cambria where he picked up Khalil and another man, Shakeem. Id. at 198:3-13. Khalil first stated that he wanted to go to 23rd and Diamond, but then Shakee[m] stated that he wanted to go to 11th and Cambria. Id. at 199:23-200:4. Appellant made a U-Turn to go back to Cambria Street and was pulled over by the police. Id. at 200:3:4.

Appellant denied robbing anyone that night and denied that the gun holster and mask were his. Id. at 203:21-204:11. Appellant stated that it was not a real gun holster or a real mask; he stated it was part of a Halloween costume his 10 year-old cousin had worn. Id. at 204:5-10.

On February 22, 2013, jury selection commenced. A panel of sixty venire persons [was] brought into the courtroom for voir dire. Defense counsel used a peremptory challenge to remove venireperson number eleven, who was Caucasian. NT, Voir Dire, 2/22/11 at 58. The district attorney objected, stating that she believed the defense was intentionally excluding white venirepersons from the panel in violation of Batson v. Kentucky, 476 U.S. 79 (1986). Id. The Court determined that the Commonwealth established a prima facie case of racial discrimination: the defense had been presented with two African Americans and accepted both, but had been presented with three Caucasians and had rejected all three. Id. at 58:8-16. The Court instructed the defense to state on the record their reasons for their strikes. Id. Defense did so and the Court permitted the peremptory challenge to stand, but cautioned counsel that a pattern had emerged. Id. at 62:19-25.

Defense counsel then used a peremptory challenge to remove venireperson twenty-four, a Caucasian, and the Commonwealth again objected under Batson v. Kentucky. Id. at 96-97:9. The Court determined that there was still a discriminatory pattern; at that point in the process the defendant

-3-

had chosen four of the five African Americans but had st[r]uck four of the five Caucasians.  Id. 97:3-9.  When asked to explain his reasoning for striking number twenty-four, defense counsel stated that his client "had a feeling" and "didn't want her."  Id. at 97:19-90.  The Court found this reasoning to be pretextual and invalid and sat juror twenty-four.[1]  Id. at 98, 105:3-4.

> [1] Juror twenty-four was later struck for hardship because she revealed she had work obligations.  NT, Voir Dire, 2/22/13 at 99:546.

Defense counsel then used a peremptory challenge to remove venireperson forty, also a Caucasian.  Id. at 142:3-20.  The Commonwealth objected pursuant to Batson.  Id.  When asked his reason, defense counsel stated that because number forty was a reporter for the Inquirer he could possibly come across stories that involve Appellant or other people involved in the crime.  Id.  Again, the court found this explanation to be pretextual and thus invalid, and sat juror number forty.  Id.  At that point, the jury of twelve was complete and the Court moved on to alternates.  Id.  Defense counsel then used a peremptory challenge to strike Caucasian juror number forty-three.  Id. at 152:5-22.  When asked why he struck forty-three, defense counsel stated only that Appellant asked him to strike the juror because "he didn't get a good vibe from her."  Id.  Noting the stark disparity between selections of African Americans and Caucasians, the court determined the 'bad vibe' reasoning again to be incredible.  Id.  Juror number forty three was sat as the first alternate.  At this point, the jury was comprised of seven African American jurors and six Caucasian jurors.

Trial Court Opinion, 3/28/14, at 1-3.

On February 26, 2013, at the conclusion of a jury trial, Appellant was convicted of the crimes stated above.  On May 24, 2013, the trial court sentenced Appellant to serve an aggregate term of incarceration of seven to sixteen years, to be followed by a term of probation of four years.  Appellant

filed a post-sentence motion on June 3, 2013, which the trial court denied on August 29, 2013. This appeal followed.

Appellant presents the following issues for our review:

I. Did the trial court abuse its discretion when it sustained the Commonwealth's objections to Appellant's peremptory challenges during jury selection?

II. Was the verdict of guilty on the charge of Criminal Conspiracy against the weight of the evidence or based on insufficient evidence where there was no proof of an agreement between Appellant and another person or persons to commit a crime?

III. Were the verdicts of guilty on the charges of violating Sections 6106 and 6108 of the Uniform Firearms Act against the weight of the evidence or based on insufficient evidence where there was no proof that the object possessed was capable of firing a shot?

Appellant's Brief at 4.

In his first issue, Appellant argues the trial court abused its discretion in sustaining the Commonwealth's objection to Appellant's use of peremptory challenges in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Appellant claims that the Commonwealth did not present a *prima facie* showing of racial discrimination by Appellant. Appellant further contends that, had the Commonwealth presented the *prima facie* showing of discrimination and the burden shifted to Appellant to justify his use of peremptory challenges against Caucasian potential jurors, he succeeded in providing race-neutral explanations for the use of the peremptory challenges.

*Batson* and its progeny prohibit the use of peremptory challenges based on race in state courts as a violation of rights to Equal Protection under the Fourteenth Amendment of the United States Constitution. *Batson*, 476 U.S. 86-87; *Commonwealth v. Harris*, 817 A.2d 1033, 1042 (Pa. 2002). *Batson* at first required a showing that the defendant was a member of the racial group that was being excluded by the prosecution's use of peremptory challenges. *Harris*, 817 A.2d at 1042. That changed, however, with the case of *Powers v. Ohio*, 499 U.S. 400 (1991). In *Powers*, the United States Supreme Court removed that requirement, indicating that the aim of *Batson* was to ensure equal protection of the rights of all potential jurors regardless of their race. *Id*. at 415-416. The ruling in *Batson* also initially was only applied to racially-based jury selection by the prosecution, but was extended by the United States Supreme Court in *Georgia v. McCollum*, 505 U.S. 42 (1992), when it held that criminal defendants were likewise prohibited from racially discriminatory use of their peremptory challenges in jury selection. *Commonwealth v. Garrett*, 689 A.2d 912, 915 (Pa. Super. 1997).

In deciding a *Batson* issue, we employ the following three-pronged test:

> First, the party objecting to the peremptory challenge must make a *prima facie* showing that the proponent of the peremptory challenge seeks to exclude a prospective juror based on race. Second, if a *prima facie* showing has been made, the

burden shifts to the proponent to articulate a race-neutral explanation for excluding the juror in question. Third, if the proponent demonstrates a race-neutral explanation, then the trial court must determine whether the objecting party has proved that the peremptory challenge is based on purposeful racial discrimination.

*Id*. at 916 (citation omitted). Our scope and standard of review for a **Batson** claim is limited to whether the trial court's finding of "discriminatory intent" was "clearly erroneous," when looking at jury selection on the whole. **Harris**, 817 A.2d at 1043.

The trial court's finding as to discriminatory intent must of necessity be accorded great deference on appeal. This is so because the ultimate question of discriminatory intent involves an assessment of credibility.

In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the [attorney's] state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Id.* (citation omitted).

We are further mindful that, "[t]he test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence." **Commonwealth v. Frye**, 909 A.2d 853, 859 (Pa. Super. 2006). "This determination is to be made by the trial judge based upon the juror's awareness and demeanor, and we will not reverse a judge's ruling on a

-7-

challenge for cause absent a palpable abuse of discretion." *Commonwealth v. Howard*, 471 A.2d 1239, 1242 (Pa. Super. 1984) (quoting *Commonwealth v. Short*, 420 A.2d 694, 699 (Pa. Super. 1980)).

We have reviewed the briefs of the parties, the relevant law, the record certified on appeal, and the opinion of the Honorable Michael E. Erdos dated March 28, 2014. It is our determination that the trial court's opinion accurately addressed the issue presented and properly concluded that the Commonwealth's *Batson* motion challenging Appellant's use of peremptory strikes to remove potential jurors was properly granted. *See* Trial Court Opinion, 3/28/14, at 3-7. Thus, we conclude that this claim lacks merit and adopt the trial court's analysis as our own.[1]

In his second and third issues, Appellant purports to argue that the verdict was against the weight of the evidence **and** that there was insufficient evidence to support his convictions of conspiracy and VUFA. However, claims challenging the weight of the evidence and sufficiency of the evidence are clearly distinct. *See Commonwealth v. Widmer*, 744 A.2d 745 (Pa. 2000) (discussing the distinctions between a claim challenging the sufficiency of the evidence and a claim that the verdict is against the weight of the evidence). "A true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which

---

[1] The parties are directed to attach a copy of the trial court opinion in the event of further proceedings in this matter.

evidence is to be believed." ***Commonwealth v. Charlton***, 902 A.2d 554, 561 (Pa. Super. 2006) (quoting ***Commonwealth v. Galindes***, 786 A.2d 1004, 1013 (Pa. Super. 2001)). Appellant attempts to address both challenges to weight of the evidence and sufficiency of the evidence in intermingled argument sections in his brief to this Court. Appellant's Brief at 22-25; 26-32.

However, to the extent Appellant endeavors to present typical challenges to the sufficiency of the evidence, we observe that such claims are waived due to Appellant's failure to specifically challenge the sufficiency of the evidence with regard to his conspiracy conviction and his VUFA convictions in his statement filed pursuant to Pa.R.A.P. 1925(b). Our courts have consistently ruled that, where a trial court directs a defendant to file a concise statement pursuant to Pa.R.A.P. 1925(b), any issues not raised in that statement shall be waived. ***Commonwealth v. Bullock***, 948 A.2d 818, 823 (Pa. Super. 2008) (citing ***Commonwealth v. Lord***, 719 A.2d 306, 308 (Pa. 1998)). ***See also Commonwealth v. Oliver***, 946 A.2d 1111, 1115 (Pa. Super. 2008) (stating that ***Lord*** "requires a finding of waiver whenever an appellant fails to raise an issue in a court-ordered Pa.R.A.P. 1925(b) statement"). Indeed, in its Pa.R.A.P. 1925(a) opinion, the trial court addressed Appellant's issues strictly as challenges to the weight of the evidence. Therefore, we must conclude that any challenges to the

sufficiency of the evidence with regard to his convictions of conspiracy and VUFA are waived, and we will only review Appellant's issues numbered two and three as challenges to the weight of the evidence.

We next address Appellant's challenge to the weight of the evidence supporting his conviction of conspiracy. In **Commonwealth v. Clay**, 64 A.3d 1049 (Pa. 2013), our Supreme Court set forth the following standards to be employed in addressing challenges to the weight of the evidence:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. **Commonwealth v. Widmer**, 560 Pa. 308, 319, 744 A.2d 745, 751-52 (2000); **Commonwealth v. Brown**, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. **Widmer**, 560 A.2d at 319-20, 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" **Id**. at 320, 744 A.2d at 752 (citation omitted). It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." **Brown**, 538 Pa. at 435, 648 A.2d at 1189.
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:
>
> > Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.* **Brown**, 648 A.2d at 1189. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give

-10-

the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. ***Commonwealth v. Farquharson***, 467 Pa. 50, 354 A.2d 545 (Pa. 1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Widmer***, 560 Pa. at 321-22, 744 A.2d at 753 (emphasis added).

This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained:

The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

***Widmer***, 560 A.2d at 322, 744 A.2d at 753 (quoting ***Coker v. S.M. Flickinger Co.***, 533 Pa. 441, 447, 625 A.2d 1181, 1184-85 (1993)).

***Clay***, 64 A.3d at 1054-1055. "Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." ***Commonwealth v. Diggs***, 949 A.2d 873, 879-880 (Pa. 2008).

Our review of the record reflects that the trial court addressed each of Appellant's challenges to the weight of the evidence and determined that they lack merit. Specifically, the trial court stated the following with regard to Appellant's challenge to the weight of the evidence supporting his conviction of criminal conspiracy:

The jury's verdict of guilty on all of the charges presented here was not shocking. In fact, it would have been shocking had Appellant not been convicted of them. First, Appellant contends that the charge of conspiracy is against the weight of the evidence because there was no evidence of an agreement between the defendant and his cohorts. However, it has long been settled that the Commonwealth need not establish the existence of a conspiracy by direct proof of a formal agreement. Commonwealth v. Roux, 350 A.2d 867, 870 (Pa. 1976). This is because direct proof of an explicit agreement can seldom be supplied. Id. As a result, a conspiracy may be proven by circumstantial evidence alone. Id. Circumstances relevant to this inquiry include an association between the alleged conspirators, knowledge of the commission of the crime, and presence at the scene of the crime. Commonwealth v. Anderson, 402 A.2d 546, 549 (Pa. Super. 1979). These circumstances, when viewed together, may "furnish a web of evidence linking an accused to the alleged conspiracy beyond a reasonable doubt." Id.

Here, [Appellant] clearly had a close association with Khalil Johnson and Shakeem Martin. He admitted to being friends with them. NT, 2/25/13 at 209:9-10. Additionally, he admitted to hanging out at Johnson's house and giving Johnson rides on previous occasions. Id. at 198:25-199:7. Both Johnson and Martin were present during the commission of the crime which occurred only a few feet from the vehicle. Both men were also in the vehicle when apprehended by the police. The three stolen phones were not found on Appellant's person, but were sitting in the cup holder, directly between Appellant and Johnson. Moreover, while only $5 of the $240 stolen was recovered from the Appellant, $140 was recovered from Johnson and $27 was

recovered from Martin. Taking all of this evidence into consideration, it is clear that the jury's verdict of guilty on the charge of conspiracy does not shock the conscious.

Trial Court Opinion, 3/28/14, at 7-8.

The jury, sitting as the finder of fact, was free to believe all, part, or none of the evidence against Appellant, as was its right. The jury weighed the evidence and concluded Appellant perpetrated the crime of criminal conspiracy. This determination is not so contrary to the evidence so as to shock one's sense of justice. We decline Appellant's invitation to assume the role of factfinder and to reweigh the evidence. Accordingly, we conclude that the trial court did not abuse its discretion in determining Appellant's weight of the evidence claim, in this regard, lacked merit.

In his final issue, Appellant argues that convictions of VUFA were against the weight of the evidence. In reviewing this issue, we again employ the standard of review set forth above.

Our review of the record reflects that the trial court addressed Appellant's challenges to the weight of the evidence and determined that they lacked merit. Specifically, the trial court stated the following with regard to Appellant's challenge to the weight of the evidence in support of his convictions of VUFA:

> Appellant also contends that the jury's verdicts of guilty on the charges of carrying a firearm without a license and carrying a firearm in a public street were against the weight of the evidence because no weapon was recovered and [because] the

witnesses' descriptions of the alleged firearm conflicted. It is well established that witness testimony constitutes evidence. Therefore presenting the physical firearm is not required for a guilty verdict on these charges. All four of the witnesses who testified at trial stated that Appellant had a firearm and all were consistent in their descriptions of the weapon. Both Sean Korney and Thomas Reardon described the firearm as a "silver handgun." NT, Trial, 2/22/13 at 15:7-9, 39:20-1. Will Viskovich stated it was a "handgun, silver on top." NT, 2/25/13 at 42:24-43:3. Nicole stated that the gun was "black and it had like gray on the top of it or like silver." NT, 2/25/13 at 19:9-11 The witnesses stated that Appellant "cocked" the weapon and that the weapon was "obviously loaded...because [Appellant] racked it." NT, Trial, 2/22/13 at 12:22, 18:18-21. The jury, as the fact finder, was free to believe the substantial amount of testimony provided by these four witnesses on the existence of this silver handgun; thus, it is clear that the verdicts of guilty on both charges were reliable and far from shocking.

Trial Court Opinion, 3/28/14, at 8-9.

Again, the jury, sitting as the finder of fact, was free to believe all, part, or none of the evidence presented against Appellant, as was its right. The jury weighed the evidence and concluded Appellant committed the two crimes of VUFA. This determination is not so contrary to the evidence so as to shock one's sense of justice. Therefore, we decline Appellant's invitation to assume the role of factfinder and to reweigh the evidence presented at his trial. Accordingly, we conclude that the trial court did not abuse its discretion in determining Appellant's weight of the evidence claims lacked merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/28/2014

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA
FIRST JUDICIAL DISTRICT OF PENNSLYVANIA
CRIMINAL TRIAL DIVISION



MAR 2 8 2014

Criminal Appeals Unit
First Judicial District of PA

Commonwealth of Pennsylvania       :
                                   :
v.                                 CP-51-CR-0011619-2012 Comm. v. Mcnatt, Gregory        CP-51-CR-0011619-2012
                                                         Opinion

Gregory McNatt

                                   7132843491                2509 EDA 2013

                                   OPINION

ERDOS, J.

     Gregory McNatt (hereinafter Appellant) was found guilty of robbery, conspiracy to

commit robbery, and carrying a firearm without a license after a waiver trial on February 26,

2013. On May 24, 2013, the Court sentenced Appellant to seven to sixteen years incarceration

followed by four years probation. On June 6, 2013, Appellant filed a motion for modification of

sentence which was denied on August 29, 2013. This appeal followed.

## FACTS

     On July 21, 2012 at 2:30 A.M., all friends, Sean Korney, Tom Reardon, Mike McEvilly, Will Viskovich and Nicole Mullen, were standing outside a house located at 2008 North 18th Street in Philadelphia waiting for a friend to come let them in. Notes of Testimony ("NT"), Trial, 2/22/13 at 11:15-12:10. A red or maroon SUV driven by Appellant stopped in front of where they were standing. Id. at 12:16-17. Two other individuals were in the car along with Appellant, one in the front passenger seat and the other in the back seat. Id. at 41:1-7.

     Appellant exited the vehicle and approached the friends with a firearm in his hand. Id. at 37:15-9. Appellant pointed the firearm at Korney's chest, racked it and said, "give me everything you got." Id. at 12:16-19, 19:2-6. Korney gave Appellant some change and cigarettes. Id. at 12:24-5. Appellant then moved down the line to Reardon, put the firearm against his chest, and told him, "you better give me everything you have." Id. at 39:7-19. Appellant reached into Reardon's pockets and took his iPhone. Id. at 40:1-4. Appellant then moved down the line, pointed the firearm at Mullen and Viskovich and demanded they give him everything they had. Id. at 40:7-9. Appellant then took McEvilly's cell phone and Mullen's purse. Mullen's purse contained approximately $240 and a bus ticket to New York. NT, 2/25/13 at 17:12-7. Appellant then jumped back into the driver seat of the SUV and sped away with his two associates. NT, Trial, 2/22/13 at 40:21-25.

     All four of the witnesses who testified at trial were consistent in their testimony regarding the firearm. Each described the weapon as being silver in color. Id. at 15:7-9, 39:20-

1

1; NT, 2/25/13, 19:9-11, 42:24-43:3. Korney stated that Appellant "cocked" the weapon and that the weapon was "obviously loaded … because he racked it." NT, Trial, 2/22/13 at 12:22, 18:18-21.

After Appellant left the scene, the police were called and arrived within minutes. Id. at 41:16-18. Police then drove the victims to 12th and Lehigh where Appellant and his cohorts had been pulled over in a maroon SUV. Id. at 42:7-21. The SUV and Appellant were identified at that location by the victims. Id. at 42:13-21. Recovered from between the center console and the driver seat was a ski mask and a brown gun holster. NT, 2/25/13 at 75:12-7. Also recovered from the center cup holder of the vehicle were three black cell phones: one iPhone, one T-Mobile, and one AT&T. Id. at 82:14-8. The cell phones were identified as the cell phones previously stolen. Id. at 83: 11-23. Officers also recovered $5 U.S. currency from Appellant, $140 from the front passenger and an additional $27 from the rear passenger. Id. at 87:22-92:25.

Appellant testified. He stated that on the night of the incident his friend Khalil Johnson called and asked him for a ride home from 13th and Cambria. Id. at 191: 1-192: 25. Appellant agreed to give Khalil a ride, but first he stopped for gas. Id. at 193:14-5. While at the gas station Appellant was approached by a man selling phones. Id. at 195:9-15. Appellant claimed that he purchased two phones from this man, an iPhone and a T-Mobile phone for $25. Id. at 196:8-15. Appellant then stated that he left the gas station and went to 13th and Cambria where he picked up Khalil and another man, Shakeem. Id. at 198:3-13. Khalil first stated that he wanted to go to 23rd and Diamond, but then Shakeen stated that he wanted to go to 11th and Cambria. Id. at 199:23-200:4. Appellant made a U-Turn to go back to Cambria Street and was pulled over by the police. Id. at 200:3-4.

Appellant denied robbing anyone that night and denied that the gun holster and mask were his. Id. at 203:21-204:11. Appellant stated that it was not a real gun holster or a real mask; he stated it was part of a Halloween costume his 10 year-old cousin had worn. Id. at 204:5-10.

On February 22, 2013, jury selection commenced. A panel of sixty venire persons were brought into the courtroom for voir dire. Defense counsel used a peremptory challenge to remove venireperson number eleven, who was Caucasian. NT, Voir Dire, 2/22/13 at 58. The district attorney objected, stating that she believed the defense was intentionally excluding white venirepersons from the panel in violation of Batson v. Kentucky, 476 U.S. 79 (1986). Id. The Court determined that the Commonwealth established a prima facie case of racial discrimination: the defense had been presented with two African Americans and accepted both, but had been presented with three Caucasians and had rejected all three. Id. at 58:8-16. The Court instructed the defense to state on the record their reasons for their strikes. Id. Defense did so and the Court permitted the peremptory challenge to stand, but cautioned counsel that a pattern had emerged. Id. at 62:19-25.

Defense counsel then used a peremptory challenge to remove venireperson twenty-four, a Caucasian, and the Commonwealth again objected under Batson v. Kentucky. Id. at 96-97:2. The Court determined that there was still a discriminatory pattern; at that point in the process the defendant had chosen four of the five African Americans but had stuck four of the five Caucasians. Id. 97:3-9. When asked to explain his reasoning for striking number twenty-four, defense counsel stated that his client "had a feeling" and "didn't want her." Id. at 97:12-20. The Court found this reasoning to be pretextual and invalid and sat juror twenty-four.[1] Id. at 98, 105:3-4.

---

[1] Juror twenty-four was later struck for hardship because she revealed she had work obligations. NT, Voir Dire, 2/22/13 at 99:5-16.

Defense counsel then used a peremptory challenge to remove venireperson forty, also a Caucasian. Id. at 142:3-20. The Commonwealth objected pursuant to Batson. Id. When asked his reason, defense counsel stated that because number forty was a reporter for the Inquirer he could possibly come across stories that involve Appellant or other people involved in the crime. Id. Again, the court found this explanation to be pretextual and thus invalid, and sat juror number forty. Id. At that point, the jury of twelve was complete and the Court moved on to alternates. Id. Defense counsel then used a peremptory challenge to strike Caucasian juror number forty-three. Id. at 152:5-22. When asked why he struck forty-three, defense counsel stated only that Appellant asked him to strike the juror because "he didn't get a good vibe from her." Id. Noting the stark disparity between selections of African Americans and Caucasians, the court determined the 'bad vibe' reasoning again to be incredible. Id. Juror number forty-three was sat as the first alternate. At this point, the jury was comprised of seven African American jurors and six Caucasian jurors.

## DISCUSSION

Appellant raises the following claims on appeal:

1. Whether the court erred in sustaining the Commonwealth's objections to the defendant's peremptory challenges during jury selection.
2. Whether the jury's verdict of guilty on the charge of conspiracy was against the weight of the evidence, where there was no evidence of an agreement between the defendant and another person or persons to commit a crime.
3. Whether the jury's verdict of guilty on the charge of Violation of the Uniform Firearms Act, Section 6106, was against the weight of the evidence where no evidence was recovered and the witnesses' descriptions of the alleged firearm conflicted and were insufficient to prove that it was a "weapon which is designed to or may readily be converted to expel any projectile by the action of an explosive or the frame or receiver of the weapon."
4. Whether the jury's verdict of guilty on the charge of Violation of the Uniform Firearms Act, Section 6108, was against the weight of the evidence where no weapon was recovered and the witnesses' descriptions of the alleged firearm conflicted and were insufficient to prove that it was a "firearm, rifle, or shotgun."

*Jury Selection*

It has long been held that racial discrimination by the State in jury selection violates the

Equal Protection Clause. *See e.g.*, Georgia v. McCollum, 505 U.S. 42, 44 (1992); Batson v

Kentucky, 476 U.S. 79, 85 (1986). In Batson, the Supreme Court established a three-part test to

evaluate alleged prosecutorial misconduct in jury selection. Id. at 95-98. First, the defendant

must make a prima facie showing of discrimination. Id. at 95-96. This can be based "solely on

3

evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." Id. at 96. If the defendant is successful in making a prima facie showing, the burden then shifts to the State to provide a race-neutral explanation for challenging the juror. Id. at 97. Finally, the trial court then must determine if the defendant has met his burden and established purposeful race-based discrimination. Id. at 98. In performing this step, "a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law." Hernandez v. New York, 500 U.S. 352, 359 (1991). The trial court's credibility determinations should be accorded great deference on appeal. Com. v. Smith, 17 A.3d 873, 893 (Pa. 2011).

In McCollum, the Supreme Court made clear that this prohibition on discriminatory voir dire practices extends to criminal defendants, finding that the "Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges." 505 U.S. at 59. "Accordingly, if the State demonstrates a prima facie case of racial discrimination by the defendants, the defendants must articulate a racially neutral explanation for peremptory challenges." Id.

In Commonwealth v. Garrett, the Pennsylvania Superior Court adopted the standards set forth in McCullom, applying the Batson inquiry to a prosecutor's claim of alleged discriminatory conduct by the defense during jury selection. 689 A.2d 912, 915 (Pa. Super. 1997). In a similar factual situation to the one presented in this appeal, the trial court reinstated a juror over a defense peremptory challenge after finding that the defense had engaged in purposeful discriminatory conduct. Id. at 917. Defense counsel believed that the juror was not being candid and did not like his demeanor. Id. Although the trial court found defense counsel's reasons for striking the challenged juror to be facially race-neutral, the court nevertheless reinstated the juror

4

finding that " the reasons offered by defense counsel were pretextual and that they were intended to disguise counsel's underlying racial motivation." Id.

On appeal, the Superior Court upheld the trial court's determination, explaining that a justification "which at first blush appears to be clear, specific and legitimate may be exposed as a pretext for racial discrimination when considered in the light of the entire voir dire proceedings." Id. at 69. The Court first found that because five of the six defense challenges were to Caucasian jurors, the "overall employment of defense counsel's peremptory challenges operated to eliminate potential white jurors." Id. at 70. Even more telling was the fact that defense counsel struck Caucasian venire persons with similar backgrounds to African American jurors who defense counsel ultimately selected. Id. Finally, the Superior Court declined to reverse the finding of the trial court that based on defense counsel's and the juror's demeanor, that the defense counsel's explanations were simply not credible. Id. at 71. Considering the voir dire process in its entirety, the Court found that the trial court did not err in reinstating the juror over the defense peremptory challenge. Id.

These principles justify the reinstatement of prospective jurors forty and forty-three in the instant appeal. Defense counsel's use of peremptory challenges has clearly proven a prima facie case of discrimination. Juror forty was the fifth Caucasian to be struck out of the eight presented. On the other hand, seven out of nine African Americans had been accepted by the defense. Additionally, "once the proponent of the challenge has offered an explanation for the peremptory challenge and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the party objecting made a prima facie showing becomes moot." Garrett, 689 A.2d at 916. Therefore the first part of the Batson inquiry was clearly met here.

5

Since a prima facie case was established, the next inquiry is whether the reasons for striking jurors forty and forty-three were facially neutral. The Court finds that they were. Juror number forty was allegedly struck because he was a reporter for the Inquirer who could possibly come across stories involving Appellant or his cohorts. NT, 2/22/13 at 142:9-15. Discriminatory intent is not inherent in this explanation.[2] The only explanation offered for the strike of number forty-three was that Appellant "didn't get a good vibe from her." NT, 2/22/13 at 152:11-4. Although this lack of reasoning is certainly suspect, the Court cannot discount the possibility that there may be bad vibes from jurors. Without a clear discriminatory intent inherent in the "bad vibe" explanation, the explanation stands as facially neutral.

However, a finding that the explanations given were facially neutral does not stop the inquiry. Even if the explanations were themselves neutral, it is clear from the record as a whole that defense counsel's reasoning was merely a pretext for race-based discrimination. As discussed above, the overall employment of defense counsel's peremptory challenges clearly operated to eliminate Caucasian jurors. More telling is the fact that defense counsel struck Caucasians with similar backgrounds to African Americans who were selected. Juror number eight, a Caucasian, was struck because she was a school teacher who worked with children and had been a victim of a crime. NT, 2/22/13 at 59:10-20. However, juror number six, an African American who worked with homeless women and their children and went to hearings on behalf of DHS, was selected, as was African American juror number five who had herself been the victim of a robbery. Id. at 61: 2-12. Caucasian juror number twenty-four was struck because her sister was robbed and her brother-in-law is a police officer; the aforementioned juror number five not only was the victim of a robbery as discussed above, but who also had one nephew who was

---

[2] However, this juror had already indicated he knew nothing about the defendant or the case, and had been instructed along with all the other jurors that he was prohibited from doing any research related to the case. Thus, while facially neutral, the explanation posited by the defense further supported the court's belief that it was pretextual.

murdered and another who was shot, as well as a cousin who is a detective, yet was ultimately selected. Id. at 97:12-98:21. Considering the voir dire process in its entirety, it is clear that the defense was employing race-based tactics and that the spoken explanations were merely pretexts for unconstitutional discrimination. Therefore, the Court did not err in reinstating jurors forty and forty-three over defense peremptory challenges.

*Weight of the Evidence*

Appellant also claims that the jury's verdicts of guilty on the charges of conspiracy, carrying a firearm without a license and carrying a firearm on a public street without a license were all against the weight of the evidence. The standard for determining if a verdict is against the weight of the evidence is well established. The weight of the evidence is exclusively for the finder of fact who is free to believe all, part or none of the evidence and to determine the credibility of the witnesses. Commonwealth v. Johnson, 668 A.2d 97, 101 (Pa. 1995), cert. denied, 519 U.S. 827 (1996). An appellate court cannot substitute its judgment for that of the fact finder. Commonwealth v. Pronkoskie, 445 A.2d 1203, 1206 (Pa. 1982). Thus, the lower court's verdict may only be reversed if it is so contrary to the evidence as to shock one's sense of justice. Commonwealth v. Hawkins, 701 A.2d 492, 500 (Pa. 1997), cert. denied, 523 U.S. 1083 (1998).

The jury's verdict of guilty on all of the charges presented here was not shocking. In fact, it would have been shocking had Appellant *not* been convicted of them. First, Appellant contends that the charge of conspiracy is against the weight of the evidence because there was no evidence of an agreement between the defendant and his cohorts. However, it has long been settled that the Commonwealth need not establish the existence of a conspiracy by direct proof of a formal agreement. Commonwealth v. Roux, 350 A.2d 867, 870 (Pa. 1976). This is because

7

direct proof of an explicit agreement can seldom be supplied. Id. As a result, a conspiracy may be proven by circumstantial evidence alone. Id. Circumstances relevant to this inquiry include an association between the alleged conspirators, knowledge of the commission of the crime, and presence at the scene of the crime. Commonwealth v. Anderson, 402 A.2d 546, 549 (Pa. Super. 1979). These circumstances, when viewed together, may "furnish a web of evidence linking an accused to the alleged conspiracy beyond a reasonable doubt." Id.

Here, the defendant clearly had a close association with Khalil Johnson and Shakeem Martin. He admitted to being friends with them. NT, 2/25/13 at 209:9-10. Additionally, he admitted to hanging out at Johnson's house and giving Johnson rides on previous occasions. Id. at 198:25-199:7. Both Johnson and Martin were present during the commission of the crime which occurred only a few feet from the vehicle. Both men were also in the vehicle when apprehended by the police. The three stolen phones were not found on Appellant's person, but were sitting in the cup holder, directly between Appellant and Johnson. Moreover, while only $5 of the $240 stolen was recovered from the Appellant, $140 was recovered from Johnson and $27 was recovered from Martin. Taking all of this evidence into consideration, it is clear that the jury's verdict of guilty on the charge of conspiracy does not shock the conscious.

Appellant also contends that the jury's verdicts of guilty on the charges of carrying a firearm without a license and carrying a firearm in a public street were against the weight of the evidence because no weapon was recovered and the witnesses' descriptions of the alleged firearm conflicted. It is well established that witness testimony constitutes evidence. Therefore presenting the physical firearm is not required for a guilty verdict on these charges. All four of the witnesses who testified at trial stated that Appellant had a firearm and all were consistent in their descriptions of the weapon. Both Sean Korney and Thomas Reardon described the firearm

8

as a "silver handgun." NT, Trial, 2/22/13 at 15:7-9, 39:20-1. Will Viskovich stated it was a "handgun, silver on top." NT, 2/25/13 at 42:24-43:3. Nicole stated that the gun was "black and it had like gray on the top of it or like silver." NT, 2/25/13 at 19:9-11. The witnesses stated that Appellant "cocked" the weapon and that the weapon was "obviously loaded…because [Appellant] racked it." NT, Trial, 2/22/13 at 12:22, 18:18-21. The jury, as the fact finder, was free to believe the substantial amount of testimony provided by these four witnesses on the existence of this silver handgun; thus, it is clear that the verdicts of guilty on both charges were reliable and far from shocking.

## CONCLUSION

In light of the foregoing, the Court did not err in reinstating jurors forty and forty-three during jury selection. Additionally, the jury's verdicts of guilty on the charges of conspiracy, carrying a firearm without a license and carrying a firearm on a public street should be upheld.

BY THE COURT:

_Michael E. Erdos_

MICHAEL E. ERDOS , J.

DATE: March 28, 2014

9

## Proof of Service

I hereby certify that I am this day serving the foregoing Order upon the persons, and in the manner indicated below:

David S. Santee, Esquire
1420 Walnut Street, Suite 911
Philadelphia, PA 19102
(first class mail)

Appeals Unit
Office of the District Attorney
Three South Penn Square
Philadelphia, PA 19107
(first class mail)

*Jennifer Plem*

Law Clerk to HON. MICHAEL E. ERDOS

Date:   March 28, 2014